Russell **THORNOCK**, et al., Plaintiffs,

v.

**KINDERHILL CORPORATION**, et al., Defendants.

Nos. 88 Civ. 3978 (RWS), 88 Civ. 5848 (RWS), 88 Civ. 7901 (RWS)–88 Civ. 7903 (RWS).

United States District Court, S.D. New York.

May 22, 1989.

 

Rosner & Goodman, New York City by Andrew J. Goodman, Jeffrey H. Hirsch, of counsel, for plaintiffs.

Spengler Carlson Gubar Brodsky & Frischling, New York City by Robert S. Carlson, Richard B. Cohen, of counsel, for defendant Kinderhill Corp.

Paul Weiss Rifkind Wharton & Garrison, New York City by Richard A. Rosen, Helen B. Kim, Maria T. Vullo, for Ecoban Capital Ltd.

## OPINION

SWEET, District Judge.

Defendants Kinderhill Corporation and its associated limited partnerships ("Kinderhill" or the "Kinderhill defendants"), Thomas A. Martin ("Martin") and Jack R. Orben ("Orben"), and James F. Martin ("Martin"), Herman F. Borneman ("Borneman"), Paul C. O'Neill ("O'Neill"), and John Wilson ("Wilson") (the "outside directors") have moved pursuant to 12(b)(6) to dismiss the amended complaint for failure to state a claim upon which relief can be granted under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; § 901(a), (c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 and 1964(c) and (d), and pursuant to Rule 9(b) for failure to plead fraud with particularity.

The *Thornock* plaintiffs and defendants in *Ecoban Capital Limited v. Ratkowski,* 88 Civ. 5848, *Ecoban Capital Limited v. Dawson,* 88 Civ. 7901, *Ecoban Capital Limited v. Blyleven,* 88 Civ. 7902, and *Ecoban Capital Limited v. DWP Investment Limited,* 88 Civ. 7903 (the *"Ecoban* cases" or *"Ecoban"*) have moved in this action pursuant to Fed.R.Civ.P. 65 to enjoin the Kinderhill limited partnerships (the "Kinderhill defendants") from disposing of any assets belonging to them other than in the normal course of business pending resolution of these actions, and to enjoin Ecoban Capital Limited ("Ecoban") from removing, selling, transferring, assigning or reducing specific assets of the Kinderhill defendants pursuant to its Loan Agreement, Promissory Note and related loan documents with Kinderhill defendants. Ecoban has moved pursuant to Fed.R.Civ.P. 11 for sanctions against the *Thornock* plaintiffs.

For the reasons set forth below, the motion to dismiss the complaint in *Thornock v. Kinderhill* is granted in part and denied in part. The *Thornock* plaintiffs' motion for a preliminary injunction is denied, as is Ecoban's motion for sanctions.

*Kinderhill's Motion to Dismiss*

The Parties and the Complaint

Plaintiffs in *Thornock* are limited partners who purchased one or more units in the defendant limited partnerships from 1980 to 1986. Defendants Kinderhill Corporation ("Kinderhill") and Martin have served as general partners of the limited partnerships, the business of which was to breed thoroughbred mares, to raise and sell the offspring and, occasionally, to race the offspring. The amended complaint (the "Complaint") alleges, but defendants dispute, that James F. Martin ("J. Martin"), Paul C. O'Neill ("O'Neill"), Herman Borneman ("Borneman") and John M. Wilson ("Wilson") were "insiders" in Kinderhill.

The limited partners purchased their interests in the partnerships pursuant to a private placement memorandum which was prepared by Martin and Kinderhill. Each memorandum included a partnership agreement, a subscription agreement, a promissory note to be signed by each partner, a purchaser questionnaire, a copy of a tax opinion by a law firm, a summary of the financial guarantee bond and an indemnification and pledge agreement.

In late 1986, an exchange offer or "roll-up" was proposed to the defendant limited partnerships by means of a private placement memorandum which was prepared by Martin and Kinderhill, by which all of the equine assets of the partnerships accepting the offer would be transferred to a new corporation, Kinderhill Select Bloodstock, Inc. ("Select"), in exchange for the transfer to each limited partnership of common stock in Select.

The Complaint alleges that Martin and Orben made oral misrepresentations on five occasions to three named plaintiffs and that the Kinderhill defendants sold limited partnership interests by means of private placement memoranda and other documents which contained untrue statements and material omissions. These omissions allegedly include an undisclosed intention to purchase stallion shares and horses from related partnerships, an undisclosed intention to invest funds of one partnership in a related partnership, an undisclosed intention to purchase racehorses in a 1986 partnership, failure to disclose that an excessive price had been paid for stallion services in another 1986 partnership, misleading historic results, and failure to disclose the general partners' contingent liability in the event of default of the limited partners.

Further, the Complaint alleges that defendants persuaded investors that they would be able to pay their obligations under their Notes solely from funds generated by their partnership investments, and that the private placement memoranda failed to disclose the leveling off and downturn in the thoroughbred market in 1984 and 1985, and that instead the Kinderhill defendants manipulated available market information, disclosing the results of only some yearling sales, but not others, to affirmatively mislead investors as to the state of the thoroughbred industry.

The Complaint also alleges that the private placement memorandum distributed with respect to the investment in Select contained essentially the same material misrepresentations and omissions as those in the limited partnership private placement memoranda.

After recounting these misrepresentations and omissions, the Complaint specifies each defendant's role in the investments. Paragraphs 26 and 27 set forth the role of the Kinderhill defendants and the individual defendants:

26. The Kinderhill Defendants either drafted or provided all the information for the drafting of the Financial Intermediaries Memoranda, the Private Placement Memoranda and the additional written communications.

27. Kinderhill, Martin, Orben, J.F. Martin, Borneman, Jepson, O'Neill and Wilson are all insiders for the purposes of determining which of the Kinderhill Defendants played what specific role in the drafting of the written communications.

Based upon these allegations, the Complaint alleges violations of § 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, RICO, and New York common law. Counts 1 through 11

plead a separate 10b–5 violation for each limited partnership. Counts 12 through 44 charge a violation of RICO in connection with the acquisition, control and operation of each limited partnership. Counts 45 and 46 are pendent claims for common law fraud and breach of fiduciary duties. The Complaint prays for repayment of all sums invested, rescission of the Notes, indemnification against any holder in due course of the Notes, treble damages under RICO and punitive damages under the pendent claim.

Standard for 12(b)(6) Dismissal

In order to dismiss a complaint pursuant to 12(b)(6), the factual allegations of the complaint must be accepted as true, *Dwyer v. Regan*, 777 F.2d 825, 828–29 (2d Cir. 1985), *modified*, 793 F.2d 457 (2d Cir.1986) and the complaint must be liberally construed and its allegations considered in the light most favorable to plaintiffs. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Unless it appears that the plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim made, the complaint should not be dismissed. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

The 10(b) Claims—Transaction and Loss Causation

■ Where a complaint alleges a broad-based scheme to defraud, the plaintiff must show "both loss causation—that the misrepresentations or omissions caused the economic harm—and transaction causation—that the violations in question caused the [plaintiff] to engage in the transaction in question." *Bennett v. United States Trust Co.*, 770 F.2d 308, 313 (2d Cir.1985) (citation omitted), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *see also Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985); *Schlick v. Penn–Dixie Cement Corporation*, 507 F.2d 374, 380 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

The Complaint alleges a series of fraudulent statements and omissions in the Kinderhill limited partnership private placement memoranda and the Kinderhill Select memorandum, as well as additional written and oral misrepresentations with respect to financial projections and discharge of the Notes without cash outlays beyond the initial investments among other things. Further, the Complaint alleges that plaintiffs relied upon these misrepresentations in purchasing their limited partnership units and in approving the exchange of the partnerships' assets for Select shares. It thus sufficiently alleges transaction causation.

■ To allege "loss causation" adequately, it is necessary to allege that the fraud—the misrepresentations or omissions—caused economic harm to the plaintiff. *See Bloor*, 754 F.2d at 61; *Bennett*, 770 F.2d at 313. Furthermore, the Court of Appeals for the Second Circuit has explained that "[t]he requirement of 'loss causation' derives from the common law tort concept of 'proximate causation'." *Manufacturer's Hanover Trust v. Drysdale Sec. Corp.*, 801 F.2d 13, 20 (2d Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 citing *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 708 (2d Cir.1980), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1987). What is central to this formulation of loss causation is that the loss must be a reasonably foreseeable result of alleged fraudulent actions. *See Manufacturers*, 801 F.2d at 20–21 (" 'loss causation' 'in effect requires that the damage complained of be one of the foreseeable consequences of the misrepresentation.' "), citing *Marbury Management, Inc.*, 629 F.2d at 708; *Bloor*, 754 F.2d at 62.

For example, in *Bennett*, the Court held that plaintiffs failed to allege loss causation adequately where they borrowed funds from U.S. Trust to purchase utility stocks which were deposited with U.S. Trust as collateral, and where the Bennetts alleged that in making these loans, U.S. Trust misrepresented to them that the Federal Reserve's margin rules did not apply to public utility stocks deposited with a bank as collateral. The market value of their utility stock decreased, and U.S. Trust liquidated the account. The Bennetts lost their equity in the stock and became liable to U.S. Trust for $1.2 million in unpaid interest and

principal on their loan. According to the Court, the Bennetts had gone to U.S. Trust with the aim of borrowing money to purchase public utility stocks. They did not allege that U.S. Trust recommended the purchases of these particular stocks, or that U.S. Trust misrepresented the value of the stocks. Rather, "[t]he Bennetts, and the Bennetts alone, decided to invest in public utility stock." 770 F.2d 313–14. Thus, U.S. Trust's alleged misrepresentations did not relate to the stock's value and did not foreseeably result in the ultimate economic loss suffered by the Bennetts.

However, in *Manufacturers Hanover Trust,* 801 F.2d 13, the Second Circuit found loss causation in overly optimistic financial statements prepared by Arthur Andersen & Co. with the foreseeable result that the marketplace would rely on the statements to overcome rumors of the company's then suspect condition. Similarly, in *Marbury Management, Inc. v. Kohn,* 629 F.2d 705, a broker trainee's misrepresentation that he was an experienced analyst was sufficiently causally related to subsequent trading losses to satisfy the "loss causation" requirement, for the "statements by their nature induced both the purchase and the retention of the securities." As the Court in *Bennett* explained, the misrepresentation in *Marbury* "induced the plaintiffs to purchase and retain specific securities despite their misgivings about the stock.... Moreover, ... the misrepresentation ... directly relate[d] to the investment quality of the stock...." *Bennett,* 770 F.2d at 314.

 The Complaint here is closer to *Manufacturers* and *Marbury* than it is to *Bennett.* Here, as in *Manufacturers and Marbury,* it was foreseeable that plaintiffs would rely on defendants' misrepresentations and would be induced to invest in the defendant limited partnerships, given the alleged fraudulent statements and omissions, many of which went to the value of the limited partnership interests. Therefore, as in this court's opinion in *Bruce v. Martin,* 691 F.Supp. 716 (S.D.N.Y.1988), "the complaint clearly alleges that the allegedly fraudulent memoranda induced

plaintiffs to purchase units in the partnership, that fraudulent statements in the Kinderhill Select memorandum induced plaintiffs' acceptance of the exchange offer, and that the fraudulent acts of the defendants resulted in plaintiffs' losses." Loss and transaction causation have been properly alleged.

**Adequacy of Pleading as to Insiders under Fed.R.Civ.P. 9(b)**

 A 10(b) claim is subject to the requirements of Fed.R.Civ.P. 9(b). Under Rule 9(b), where multiple defendants are charged with fraud, the complaint must be specific as to the nature of each defendant's alleged participation in the fraud. *See Natowitz v. Mehlman,* 542 F.Supp. 674, 676 (S.D.N.Y.1982). Here, the Complaint adequately gives notice of the alleged fraud, *see Bruce v. Martin,* and, as to the Kinderhill defendants, Martin and Orben, it adequately pleads fraud, for these defendants are insiders or affiliates, and thus there is no need to make a specific connection between fraudulent representations in an offering memorandum and the particular defendants. *See DiVittorio v. Equidyne Extractive Indus, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987).

**Inadequacy of Pleading as to the Outside Directors under Rule 9(b)**

 However, the 10(b) claims against the outside directors do not survive scrutiny under Rule 9(b). The outside directors contend that they were outsiders to Kinderhill and had minimal contact with the corporation, that none of them were employees of Kinderhill, and that aside from modest director's fees for meetings attended and expense reimbursements, none had ever received any remuneration from Kinderhill. There is no allegation that they drafted, prepared, revised or disseminated any of the documents alleged to be misleading. Their only alleged involvement with Kinderhill consisted of their attendance at board meetings.

The Complaint does not allege that the outside directors made any misrepresentations or omissions. The alleged misrepre-

sentations were contained solely in the private placement memoranda and other documents "distributed by the Kinderhill defendants" generally without differentiation among defendants. There are no allegations that the outside directors participated in the management of Kinderhill or of partnerships named as defendants in this action.[1]

The only allegation made against the outside directors is the conclusory statement that they "are all insiders for the purposes of determining which of the Kinderhill Defendants played what specific role in the drafting of the written communications." Compl. ¶ 27. Although it is true that where defendants are insiders or affiliates participating in an offer of securities, "no specific connection between fraudulent representations in [an] Offering Memorandum and particular defendants is necessary," *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d at 1247, plaintiffs have cited no such rule where the defendants were outside directors who are not alleged to have participated in the offer of securities in question, and where no facts allege the contrary. Rule 9(b) is designed to avoid naming individuals as defendants and forcing them to defend an action for which there is no basis, and then using discovery to find a basis for the action.

■ Furthermore, there is no proper allegation that the outside directors had the requisite scienter for a 10(b) violation. A plaintiff cannot establish scienter on the part of an outside director simply because he relies on the officers and inside directors who operate the corporation. *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1281 (2d Cir. 1973). Thus, the claims against the outside directors are dismissed for failure to state a cause of action.

The Rico Claims

■ In order to state a claim under RICO, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.*

*L. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3284–85, 87 L.Ed.2d 346 (1985). Further, to allege a pattern of racketeering activity, a complaint must allege "continuity plus relationship." *Id.* n. 14.

The recent decisions of the Court of Appeals for the Second Circuit, *Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir.1989) and *United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) did not eliminate the need for continuity in asserting a RICO claim; rather, they shifted the focus of the continuity element from enterprise to pattern. *Indelicato*, 865 F.2d at 1381; *Beauford*, 865 F.2d at 1391. Thus, although a RICO claim may be pleaded properly without an allegation that an enterprise has no demonstrable end point, it must be alleged that "there is continuity or a threat of continuity" to the racketeering acts. *Indelicato* at 1381; *see also Beauford* at 1391.

To establish the threat of continuing activity, the complaint must "plead a basis from which it could be inferred that the acts of racketeering activity were neither isolated nor sporadic." *Beauford* at 1391. One such basis can be the nature of the enterprise. *Indelicato* at 1383. For example, "[e]ven where the enterprise is legitimate, if the racketeering acts were performed at the behest of an organized crime group, that fact would tend to belie any notion that the racketeering acts were sporadic or isolated." *Id.* at 1384.

However, the nature of the enterprise is not always sufficient to establish a threat of continuity:

[w]hen ... there is no indication that the enterprise whose affairs are said to be conducted through racketeering acts is associated with organized crime, the nature of the enterprise does not of itself suggest that racketeering acts is associated with organized crime, the nature of the enterprise does not of itself suggest that racketeering acts will continue, and proof of continuity or the threat of continuity of racketeering activity must be

---

1. In *Bruce v. Martin*, there was no examination of this issue because the outside directors were not named as defendants at that time.

found in some factor other than the enterprise itself.

*Beauford* at 1391. There is no allegation here of mob-relatedness, as there was in *Indelicato.* Similarly, this case is different from *Beauford,* where the Court found continuity based upon the fact that not all of the apartment units were sold, and that there would be further amendments to the offering plan. As further explained in this court's opinion of May 18, 1989 in *Bruce v. Martin,* 691 F.Supp. 716 (1988), there is no threat here of continuing activity. There is nothing in the Complaint which suggests that there is a possibility of further investment in the defendant limited partnerships or in new limited partnerships.

Thus, the RICO claims are dismissed for failure to adequately plead continuity. However, as in the related case of *Bruce v. Martin,* plaintiffs are granted leave to amend their Complaint to show that there is continuity or a threat of continuity in the alleged racketeering activities.

Pendent Jurisdiction Claims

Because certain of the claims pursuant to 10(b) of the Securities Exchange Act of 1935 remain, this court will continue to exercise pendent jurisdiction over the state common law fraud claims.

*The Preliminary Injunction*

Prior Proceedings and Facts

Certain of the facts and prior proceedings of this case are set forth in this court's opinion dated December 28, 1988, *Thornock v. Kinderhill,* 702 F.Supp. 468 (S.D.N.Y.1988) (the "December Opinion"), and this court's opinion in a related case, *Bruce v. Martin,* 691 F.Supp. 716 (S.D.N.Y.1988), familiarity with which is assumed.

*Thornock* and *Bruce,* with which *Thornock* is consolidated for pre-trial purposes, arise from the allegedly fraudulent sale of limited partnership units in horse breeding and racing limited partnerships organized and promoted by Kinderhill Corporation ("Kinderhill") and its principals. The Thornock plaintiffs seek, *inter alia,* rescission of the promissory notes (the "Notes") underlying their investment on the grounds that they are fraudulently induced.

In October, 1987, Ecoban loaned Kinderhill Select Bloodstock, Inc. ("Select") $1,849,000. As security for the loan, Ecoban became the holder of the Notes for Kinderhill Farm Breeding and Racing Program 1985, Series III L.P., pursuant to a series of agreements (the "Loan Agreements"). To secure the loan further, Select issued a promissory note to Ecoban for the loan amount, due April 30, 1991; Ecoban reserved to Select's credit approximately 33% of the loan proceeds; Ecoban received a Negative Pledge from the Kinderhill entities promising that they would not further encumber the Kinderhill Farm in Old Chatham, New York; Ecoban was given the right, on notice, to attach a portion of Kinderhill's bank account at Key Bank, to the extent of any default; and Ecoban received Martin's 100% full recourse guaranty.

Select has defaulted on its Note to Ecoban. Ecoban's attempts to satisfy Select's default by resort to the investor Notes have been unsuccessful, since the defendants in the *Ecoban* actions, who are plaintiffs in *Thornock,* have declined payment in view of their fraudulent inducement claims in *Thornock.* Ecoban has brought collection actions on these promissory Notes. Ecoban has also sought to enforce its security under the Loan Agreements between Kinderhill and Ecoban, and has been granted summary judgment toward that end by an opinion filed on May 19, 1989.

According to the deposition testimony of the Ecoban principal who negotiated the Kinderhill transaction, Gabriel Zalka ("Zalka"), Ecoban intends to attach Kinderhill's bank account at Key Bank and use part of the loan proceeds Ecoban reserved out of Select's credit to satisfy Select's default. Moreover, according the affidavit of Andrew J. Goodman, attorney for *Thornock* plaintiffs, in June 1988, during the pendency of this action, Kinderhill has encumbered assets with the intent to frustrate any possible judgment in this action. In particular, in June 1988, Kinderhill refinanced its debt to Key Bank and in the process encumbered $6,000,000 of assets. Moreover, Kinderhill purchased the partnership's yearlings with long term unse-

cured notes, indicated an intent to sell the yearlings imminently, but declined to segregate the proceeds or offer assurances that the notes would be satisfied, as the *Thornock* plaintiffs requested.

Plaintiffs in *Thornock* have moved to enjoin further actions by Ecoban on the grounds that they will deplete the Kinderhill defendants' assets and hence any possibility of judgment against them, or, in the alternative, should Ecoban attach and foreclose on the Kinderhill bank account or otherwise enforce its security, to restrain Ecoban from disbursing the assets and instead to maintain them in a separate, interest bearing account pending resolution of these actions. They also seek to enjoin the Kinderhill defendants from disposing of their assets other than in the normal course of business.

Standards for a Preliminary Injunction

In order to obtain a preliminary injunction, the movant must show:

(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Deeper Life Christian Fellowship, Inc. v. Board of Education,* 852 F.2d 676, 679 (2d Cir.1988); *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.,* 832 F.2d 1311, 1314 (2d Cir.1987); *Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d 264, 273 (2nd Cir.1986).

*Failure of Jurisdiction over Ecoban*

■ Because Ecoban has not been sued in these lawsuits, the court lacks subject matter jurisdiction to enjoin its actions. *See Stewart v. United States I.N.S.,* 762 F.2d 193, 198–99 (2d Cir.1985) (preliminary injunctive relief may be obtained "[o]nly after an action has been commenced"); *Williams v. State University of New York,* 635 F.Supp. 1243, 1246 (E.D.N.Y. 1986) ("prior to the filing of a complaint a court lacks subject matter jurisdiction and is powerless to grant preliminary injunctive relief"). Further, nothing in the four *Eco-*

*ban* actions, in which Ecoban is seeking to enforce payment under the Notes it holds as security for the Select loan, gives this court subject matter jurisdiction in this action for injunctive relief against Ecoban. *See Williams,* 635 F.Supp. at 1246. Any relief against Ecoban by the *Thornock* plaintiffs is therefore unavailable.

Irreparable Harm

■ According to the *Thornock* plaintiffs, the inability to recover damages should they ultimately prevail in these actions is sufficient irreparable harm to enjoin any dissipation of Kinderhill assets pending determination of the actions. However, this injury is only speculative injury which *may* occur and which *may* pose a threat to defendants' assets if plaintiffs can establish their claims, and thus does not constitute irreparable harm. Possible or speculative injury is not enough to establish irreparable harm; rather, movants must demonstrate the "probability of irreparable injury." *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 756 (2d Cir.1979); *see also Salant Acquisition Corp. v. Manhattan Indus., Inc.,* 682 F.Supp. 199, 202 (S.D.N.Y.1988) (plaintiff must show that the alleged threat of harm is "actual and imminent."). Similarly, even if the court had jurisdiction over Ecoban, actions contemplated by Ecoban to enforce Notes executed by some plaintiffs and to resort to other collateral does not constitute irreparable harm.

Therefore, there is no irreparable harm, and the preliminary injunction will not issue.

Attachment

■ The *Thornock* plaintiffs also fail to meet the requirements for an attachment against the Kinderhill defendants. New York law has strict requirements for such an attachment. New York CPLR § 6201 requires that:

1. the defendant is a foreign corporation or not a resident or domiciliary of the state; or

2. the defendant resides or is domiciled in the state and cannot be personally

served despite diligent efforts to do so; or

3. the defendant, with intent to defraud his creditors, has assigned, disposed of or secreted property, or removed it from the state or is about to do any of these acts....

As seen, the *Thornock* plaintiffs contend that the Kinderhill defendants have encumbered assets with the intent to frustrate any possible judgment in this action. However, they have presented no evidence of intention to defraud creditors. Thus, there is no basis for the attachment.

 Finally, even if plaintiffs had made the required showings, it would still be possible to deny the harsh remedy of attachment, for attachment is a discretionary remedy. *See Merrill Lynch Futures Inc. v. Kelly,* 585 F.Supp. 1245, 1259 (S.D.N.Y. 1984); *Elliott v. Great Atlantic & Pacific Tea Co.,* 11 Misc.2d 133, 171 N.Y.S.2d 217, *aff'd* 11 Misc.2d 136, 179 N.Y.S.2d 127 (1957).

*Motion for Rule 11 Sanctions*

Rule 11 requires an attorney to make a "reasonable inquiry" to determine that pleadings and motions are "well grounded in fact" and "warranted by existing law" or constitute "a good faith argument for the extension, modification, or reversal of existing law," and that they are not interposed for the purpose of harassment or delay. According to the Court of Appeals for the Second Circuit:

If the inquiry was objectively reasonable under the circumstances and disclosed a reasonable factual basis for the claim, then sanctions are not appropriate. On the other hand, if the attorney either failed to make an objectively reasonable inquiry or pursued a claim for which no basis was disclosed by such an inquiry, then sanctions are appropriate.

*Calloway v. The Marvel Entertainment Group,* 854 F.2d 1452, 1470 (2d Cir.1988), *cert. granted,* — U.S. —, 109 S.Ct. 1116, 103 L.Ed.2d 179 (1989). Nothing in the facts indicates that the *Thornock* plaintiffs failed to make an objectively reasonable inquiry into the basis of their claims.

Thus, Ecoban's motion for Rule 11 sanctions is denied.

*Conclusion*

For the reasons set forth above, the Kinderhill defendants' motion to dismiss the Complaint is granted as to the securities fraud claims against the outside directors and the RICO claims, and denied as to the securities claims against the Kinderhill defendants and the common law fraud claims. The Thornock plaintiffs' motion for a preliminary injunction is denied, as is Ecoban's motion for sanctions.

Submit order on notice.

It is so ordered.