**JOINT VENTURE ASSET ACQUISITION, as assignee of Defendants' Promissory Notes payable to First City Federal Savings Bank, Plaintiff,**

v.

**Anant BHOGAONKER, Asha Bhogaonker, Shahab Moghul, Ghulam Moghul, Ahmed Knan, Mirza Ahmad, Yasmin Ahmad, Hare K. Patnaik, Ghaiyur Alam, Tahzibul Rizvi, Gautam Pandhi, Chandrika Pandhi, Khurshed Kasad, Zinobia Kasad, Bharat Shah, Bina Shah, Gunvant Shah, Sulochana Shah, Surya Misra and Bishnupriya Misra, Robert Ross, Shrabonnie Ghosh, Linval Fleetwood, Henry Tazzia, Defendants.**

Nos. 87 Civ. 5308 (RWS), 87 Civ. 5323 (RWS), 87 Civ. 5331 (RWS) to 87 Civ. 5334 (RWS), 87 Civ. 5337 (RWS), 87 Civ. 5339 (RWS), 87 Civ. 5341 (RWS) to 87 Civ. 5343 (RWS), 87 Civ. 5390 (RWS), 88 Civ. 0914 (RWS), 87 Civ. 7687 (RWS), 87 Civ. 8534 (RWS) and 87 Civ. 7431 (RWS).

United States District Court, S.D. New York.

July 19, 1991.

Bizar Shustak Martin & Schneider (Gayle S. Sanders, of counsel), New York City, for plaintiff.

Richard Simon, Hauppauge, N.Y., for defendants.

## OPINION

SWEET, District Judge.

The plaintiff Joint Venture Asset Acquisition ("JVAA"), assignee of the promissory notes at issue (the "Notes"), executed by the individual defendants (the "Defendants") in favor of First City Federal Savings Bank (the "Bank"), seeks judgment for the full amount of the Notes, all accrued interest, and legal fees and disbursements. Upon the following findings and conclusions reached after a non-jury trial, judgment will be entered granting the relief sought.

### The Parties

First City National Bank and Trust Company, formerly known as First City Federal Savings Bank, was a National Banking Association with offices in New York City. On or about December 20, 1989, the Comptroller of the Currency declared the Bank insolvent, and appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver.

JVAA is a joint venture formed by the founder, former president and a major shareholder in the Bank, Richard Greenberg, along with his brother Frederick Greenberg. The interests in JVAA are held in proportion to the owners' shares in the Bank. In 1988 JVAA acquired the rights to monies due or to become due on the Defendants' Notes, although the Bank continued to hold the Notes. Immediately prior to the declaration of insolvency of the Bank, the Bank assigned the Notes to JVAA.

The Defendants are individuals residing in Michigan, New Jersey, Florida and Illinois who obtained loans from the Bank in 1986 in order to invest in various tax-advantaged limited partnerships sponsored by Forum Companies, Inc. ("Forum"). Twelve of the Defendants invested in Boston Place Associates, Ltd. ("Boston Place"), a real estate syndication of an office building in Tulsa, Oklahoma. Defendants Linval Fleetwood ("Fleetwood"), Robert Ross ("Ross"), Henry Tazzia ("Tazzia"), and Shrabonnie Ghosh ("Ghosh") invested in other limited partnerships sponsored by Forum.

### Prior Proceedings

In July 1987, the Bank commenced individual actions against the twelve Defendants who had been investors in Boston Place (the "Boston Place litigation"), all of whom had defaulted on their loans, and in the latter part of 1987 and early 1988 instituted suits against Ross, Ghosh, Fleetwood and Tazzia, who also had defaulted on their loans. In all of the actions, the Bank sought to recover unpaid principal and accrued interest on the Notes, as well as the costs of collection.

In November 1987 the Bank moved for summary judgment in the Boston Place litigation. This motion was denied by an opinion of March 31, 1988, on the grounds that while the Bank had established a *prima facie* claim on the Notes, a genuine issue of fact existed as to whether payments to National Capital Corporation ("NCC"), a loan broker, of 10% of the loan proceeds constituted an undisclosed increase in the interest rate charged by the Bank to Defendants, because of an alleged relationship between the Bank and NCC. *First City Federal Savings Bank v. Bhogaonker*, 684 F.Supp. 793 (S.D.N.Y.1988) ("the 1988 Opinion").

In November 1988 the Boston Place defendants and defendant Ross moved for partial summary judgment, alleging that because the Notes provided for interest at the Bank's reference rate, the Notes were non-negotiable and the Bank could not be a holder in due course. The Bank cross-moved for summary judgment. By opinion and order dated May 26, 1989, the Defendants' motion for partial summary judgment was denied on the grounds that the Notes were negotiable under the Uniform Commercial Code, and the Bank's cross-motion was denied, on the grounds that while the Defendants had failed to establish a material issue of fact as to whether the fee received by NCC constituted additional and undisclosed interest, they had raised an issue of fact as to whether the Bank was aware of Forum's financial difficulties and cash flow problems in the fall of 1986. *First City Federal Savings Bank v. Bhogaonker*, 715 F.Supp. 1216 (S.D.N.Y.1989) ("the 1989 Opinion").

The Boston Place litigation was consolidated with the Ross, Tazzia, Fleetwood and Ghosh actions for trial. The non-jury trial commenced on October 17, 1989 and was adjourned from time to time to permit additional defense testimony.

On December 20, 1989, prior to the Bank's rebuttal case, the Bank was declared insolvent, and the FDIC was appointed as Receiver. Immediately prior to the declaration of insolvency, Defendants' Notes were assigned to JVAA.

Thereafter, the FDIC obtained an order from the Honorable Vincent L. Broderick dated December 22, 1989 staying all actions in this district involving the Bank. The stay subsequently expired, and in May 1990 JVAA moved to intervene in these actions as a co-plaintiff. By order dated August 27, 1990, the FDIC was substituted as plaintiff and the Defendants' counterclaims were dismissed with prejudice, and JVAA was permitted to intervene, whereupon FDIC was dismissed from the action.

The trial resumed on December 5, 1990 and again was adjourned to permit an application to be made to open the record for the testimony of certain of the Defendants. Final briefs were submitted by JVAA on February 6, 1991, and no opposition brief has been submitted by the Defendants.

*The Facts*

The principal of Forum, which sponsored the limited partnerships in which the Defendants invested their loan proceeds, was Ronald Williams ("Williams"), who was subsequently indicted for securities fraud and who entered into a cooperation agreement with the Government under which he provided information with respect to John Galanos, also under indictment. In the course of these events, subsequent to the Fall of 1986, the Forum companies and their limited partnerships became defunct.

In the spring and summer of 1986, Williams had established banking relationships with recognized financial institutions. His plan for acquiring and syndicating real estate interests appeared successful. The Defendants invested in Williams' limited partnerships Boston Place, Bedford Associates, Ltd. ("Bedford"), The Learning Experience Boca Raton Associates, Ltd., ("Learning Experience"), Airport Marina Associates, Ltd. (Airport Marina) and Texoma Associates, Ltd. ("Texoma").

By the terms of each of the Notes, each Defendant agreed to pay the Bank the principal sum of the Note in equal quarterly installments, together with interest at an annual rate equal to 2% above the Bank's reference rate of interest as publicly announced by the Bank from time to time, and upon default in payment of any

amount due thereunder to pay the entire amount of the Notes without notice or demand and to waive the right to interpose any set-off or counterclaim in any action brought under the Notes.

At the same time they signed the Notes, the Defendants executed Borrower's Letters in which they instructed the Bank to pay the proceeds of their loans directly to the Forum limited partnership in which they were investing, and in which they acknowledged that the Bank was acting solely as a lender and not as an investment advisor, that the Bank had made no attempt to analyze or evaluate Defendants' intended investment, that the Bank had made no representations to Defendants to induce them to request their loans, and that the Bank had made no representations concerning the partnership, its general partner, or its financial strength, prospects or integrity. The Defendants also agreed in the Borrower's Letter to hold the Bank harmless and to release the Bank from any and all claims they might have relating to or arising out of their investment.

Williams had arranged with Richard and Frederick Greenberg that loans would be granted by the Bank to the investors upon submission of documentation by NCC as a loan broker which would receive 10% of the loan amount for its services. In addition, NCC was party to an agreement with Williams entered into on November 14, 1986 for NCC to provide consulting services for one year at a fee of $168,000. There was no showing that any of the investors offered by NCC to the Bank were rejected, nor any evidence to establish that the Bank had any direct financial interest in the NCC/Williams arrangements, although the Bank and NCC shared office space and computer facilities. At some time in late October or early November, Richard Greenberg was advised that the Boston Place transaction was not going to close and that the investors would be switched to the Learning Experience.

The Defendants all defaulted in payments due under their Notes. The Bank has established the outstanding principal due on Defendants' Notes and the calculation of accrued interest for each of the Defendants as of October 13, 1989.

The Notes also provided that the Defendants would reimburse the Bank for all costs and expenses, including reasonable attorneys' fees and disbursements, incurred by the Bank in connection with the enforcement of the Defendants' obligations thereunder and the Bank has established the legal fees and disbursements through July 25, 1990.

The Defendants presented evidence in the form of the testimony of Thomas Easley ("Easley"), who served as a manager of corporate accounting and later as Executive Vice President and Treasurer of Forum before becoming a consultant to the company in September 1986. Easley testified regarding the circumstances of many of the loans at issue here and how the proceeds of those loans were paid out.

In its rebuttal case, the Bank offered further evidence relating to twenty-three loans which were disbursed on November 14, 1986. These loans, which were made to investors in various Forum partnerships, totalled $774,250. The Bank did not identify which of the eighteen loans to the Defendants in these cases were included among the twenty-three loans. The evidence indicated that, of the $774,250 total, slightly less than half, or $382,120 was in fact transferred to four Forum partnerships, by means of four teller's checks: $106,500 to Boston Place (Check # 001876), $93,795 to The Learning Experience (Check # 001877), $146,950 to Bedford (Check # 001878) and $34,875 to Redbud Bay Associates, Ltd. ("Redbud") (Check # 001879).[1] Plaintiff's Exs. 71A–71D.

The Bank also deposited $318,650.00, or approximately 41% of the total amount, directly into Forum's general account at the Bank. Pl.Ex. 74. According to the Bank, this amount represented transfers of

---

1. Thus none of the money disbursed on November 14, 1986 was transferred to Airport Marina or Texoma. One of the three loans to Fleet-wood, for $19,000, was directed to Airport Marina, while Tazzia's $35,000 loan was intended for Texoma.

$116,225 from the account of Learning Experience, $75,000 from the account of Redbud, and $50,000 from the account of Bedford, all of which were performed pursuant to written authorizations from Williams as general partner of each of the partnerships. Pl.Ex. 72A–72D.

The remaining $73,480 of the total disbursement was then applied to reduce the outstanding balance on some of the twenty-three loans, due to additional payments which had already been made directly to the Forum partnerships by the borrowers.

Of the money transferred to Forum's general account, $245,425.00 was then transferred to NCC's account, pursuant to written instructions from Forum. This amount represented NCC's 10% fee of $77,-425 and its consulting fee of $168,000.00. Next, $13,866.71 was transferred to the account of Fidelity Funding, Inc. ("FFI"), a company owned by NCC's principal, also pursuant to written authorization from Forum.

Finally, $59,358.31 was paid by Forum back to the Bank as the purchase price of a loan which the Bank had made to investors in an earlier Forum partnership and which the Bank was selling to Forum because the borrowers no longer wanted the loan.[2]

By the spring of 1987 Williams' projects began to unravel and his financial problems became known within and without his organization, culminating ultimately in bankruptcy, indictment, and among other things, the instant litigation.

*Discussion*

1. The Defendants Have Failed To Establish a Defense to Payment of the Notes.

Throughout this litigation the parties and the Court have devoted a good deal of attention to the issue of whether the Bank qualified as a holder in due course of the Notes. The relevance of this issue, as explained in the 1988 Opinion, is that if the Bank was not a holder in due course, then it would have been subject to "all claims and defenses against payment on the Notes

available pursuant to N.Y.U.C.C. § 3–306." 684 F.Supp. at 797 n. 2.

However, despite the attention which has been paid to this issue, the facts as found above establish that the Defendants simply have no defense to payment of the Notes, and that therefore the Bank's status as holder in due course is not relevant to determination of the case.

■■■ The Defendants' affirmative defense here is based on the fraudulent acts of Williams and the Bank's alleged knowledge of and complicity in that fraud. However, while these allegations might well state a claim against Bank for having participated in and having aided and abetted Williams' fraud, they do not constitute a defense to payment of the Notes. Under New York law, "in order for fraudulent inducement to prevent enforcement of a promissory note, it generally must be based on misrepresentations concerning the terms or conditions of the loan itself." *Thornock v. Kinderhill,* 749 F.Supp. 513, 518 (S.D.N.Y.1990); (citing *Hunt v. Bankers Trust Co.,* 689 F.Supp. 666, 673–74 (N.D.Tex.1987) (applying New York law) and *Millerton Agway Co-op., Inc. v. Briarcliff Farms, Inc.,* 17 N.Y.2d 57, 268 N.Y.S.2d 18 215 N.E.2d 341 (1966)); *cf. Citicorp Intern. Trading Co. v. Western Oil & Refining Co.,* 88 Civ. 5377 (RWS), 1991 WL 4502, slip op. at 6–7 (S.D.N.Y. Jan. 15, 1991) (borrower may escape liability on promissory note 'by a showing that plaintiff has not complied with some condition of the [loan] agreement') (quoting *Lyons v. Cates Consulting Analysts, Inc.,* 88 A.D.2d 526, 526, 450 N.Y.S.2d 19, 20 (1st Dep't 1982). The Defendants have not established that the Bank ever misled them about any of the terms or conditions of the Notes.

■■■ Furthermore, in New York a waiver will overcome a defense to enforcement of a promissory note provided that the waiver explicitly addresses the defense in question and that it was knowingly entered into by the promisor. *Citibank, N.A. v. Plaping-*

---

**2.** The amounts transferred out of the Forum account thus total $318,650.02, slightly in excess of the $318,650 transferred to Forum as part of the disbursement.

*er,* 66 N.Y.2d 90, 94–95, 495 N.Y.S.2d 309, 311, 485 N.E.2d 974, 976 (1985); *First City National Bank and Trust Co. v. Heaton,* 165 A.D.2d 710, 563 N.Y.S.2d 783 (1st Dep't 1990); *First City National Bank and Trust Co. v. Tobias,* 156 A.D.2d 267, 548 N.Y.S.2d 655 (1st Dep't 1989); *Seaman–Andwall Corp. v. Wright Machine Corp.,* 31 A.D.2d 136, 295 N.Y.S.2d 752 (1st Dep't 1968), *aff'd,* 29 N.Y.2d 617, 324 N.Y.S.2d 410, 273 N.E.2d 138 (1971); *First City National Bank and Trust Co. v. Reitberg,* No. 4572/88, slip op. at 4 (N.Y.Sup.Ct. Dec. 12, 1988) ("*Reitberg II*"); *First City National Bank and Trust Co. v. Reitberg,* No. 4590/88, slip op. at 4 (N.Y.Sup.Ct. Dec. 9, 1988) ("*Reitberg I*").

 Here the Defendants waived any claims against the Bank relating to or arising out of their investment in Forum limited partnerships. Each of the Defendants signed a Borrower's Letter which expressly provided, *inter alia:*

> The Bank has made no representations to me, express or implied, to induce me to request this loan. The bank has given no opinion or advice as to whether it is wise or prudent for me to invest funds in the Program. The Bank has made no representations concerning the Program, its General Partner(s) or their financial strength, prospects, or integrity. I have made my investment decision based on such independent investigation as I have deemed necessary. I understand that the Bank has not participated in the preparation of an Offering memorandum or similar document for the Program and therefore is not responsible for any statement contained in or the completeness of any such document. I assume all responsibility for keeping myself informed of the financial condition and operation of the Partnership and agree that the Bank shall have no duty to advise me of any such information. I agree to hold the Bank harmless and do hereby release the Bank from any and all claims that I may have relating to or arising out of my investment.

In these Borrower's Letters, the Defendants explicitly waived any claims of fraud relating to or arising from their investments. At trial the Defendants offered no evidence that they did not understand the implications of this waiver when they signed the Borrower's Letters. Therefore, under New York State law, the waiver is valid. *Heaton, supra,* 165 A.D.2d at 710, 563 N.Y.S.2d 783; *Tobias, supra,* 156 A.D.2d at 267, 548 N.Y.S.2d 655; *Reitberg II, supra,* slip op. at 4; *Reitberg I, supra,* slip op. at 4; *Thornock, supra,* 749 F.Supp. at 519.

*Conclusion*

Based on the findings and conclusions set forth above, JVAA is entitled to judgment for the outstanding principal and accrued interest on Defendants' Notes, as well as legal fees and disbursements incurred. Submit judgment on notice.

It is so ordered.